JAMES R. LITZ, *Administrator of the Estate of* JOHN R. COVEY, *deceased* v. THE EXCHANGE BANK OF ALVA.

(Filed September 6, 1905.)

1. REAL PROPERTY—Mortgage Lien. A mortgage does not convey title to the mortgaged property, but only creates a lien thereon.

2. SAME—Right to Extinguish. A mortgagor has the right to pay the indebtedness secured by the mortgage, and extinguish the lien at any time before the property is sold by the mortgagee.

3. PERSONALTY—Descends to Whom. Personal property of one who dies intestate passes to the heirs of such intestate, subject to the control of the probate court, and to the possession of any administrator appointed by the court for the purpose of administration.

4. SAME—Sale of, When Mortgaged. Where a person or corporation before the granting of letters of administration, sells or alienates any of the property of a decedent, which is covered by a chattel mortgage, he, or it, is chargeable therewith, and liable to an action by the administrator of the estate for double the value of the property so sold or alienated.

(Syllabus by the Court.)

*Error from the District Court of Woods County; before J. L. Pancoast, Trial Judge.*

*H. A. Noah,* for plaintiff in error.

*T. J. Womack* and *Strang & Devereux,* for defendant in error.

## STATEMENT OF FACTS.

On April 15th, 1895 John R. Covey executed and delivered his promissory note to the Exchange Bank of Alva, in the sum of $1451.40 due ninety days after date, and to secure the payment thereof executed a chattel mortgage to said bank upon one hundred and forty-seven head of cattle. On May 14, 1895, said John R. Covey was killed. On May 15, 1895, the bank proceeded to take possession of the cattle covered by said mortgage. On the 17th or 18th of May, 1895, the bank gave the statutory notice of the foreclosure of its mortgage, and on the 28th of May, 1895, the cattle covered by said mortgage were sold to one J. W. Maxey, for $632.10, being $4.30 per head. On May 29, 1895, there was a special administrator appointed by the probate court of Woods county. The decedent, John R. Covey, died intestate. This action was instituted against the Exchange Bank of Alva by the administrator of the estate of John R. Covey, to recover double the value of the property sold and alienated by the bank, the holder of said chattel mortgage, after the death of said Covey, and before a special or general administrator was appointed. The issues having been joined, the cause was submitted to the court, without a jury, upon the following agreed statement of facts:

### "AGREED STATEMENT OF FACTS.

"It is hereby stipulated and agreed by and between the parties to this action by their respective attorneys that the facts relevant to the issues herein are as follows:

"That one John R. Covey, of Woods county, Oklahoma Territory, did on April 15, 1895, execute and deliver his certain chattel mortgage to the Exchange Bank of Alva, Oklahoma, a corporation, upon 117 head of native yearling steers, branded "Z" on left hip, and 35 head of native yearling steers,

branded "A" on left side, to secure the. payment of a promissory note of even date therewith, for one thousand four hundred fifty-one ($1451.40) and 40|100 dollars, due ninety days after date of said note, and that said note was made payable to the order of said The Exchange Bank of Alva.    That John R. Covey was then the said owner of said cattle.

"That afterwards on the 14th day of May, 1895, the said John R. Covey was killed.

"That on the succeeding day the cattle were scattered and no person was in charge of them; and that at that time the conditions in the  neighborhood and in the  locality in which the cattle described in said mortgage were then being held, were such as furnished reasonable grounds in the minds of the officers of the said The Exchange Bank of Alva, that its security was liable to, and was being impaired and that there actually was danger of the security being impaired by the loss of the property, or a part thereof, described in said mortgage.

"That on the said 15th day of May, 1895, the said The Exchange Bank of Alva, took charge of all of said cattle that could then be found and began active work to get all of the same together, and  succeeding during the  following two weeks in finding 147 head of said cattle.

"That all the said cattle were taken possession of by the said The Alva Exchange Bank, under and by virtue of the, chattel mortgage heretofore mentioned, a copy of which is attached to the plaintiff's petition and also to defendant's answer, each being marked Exhibit "A" and that such copy is hereby made a part of this agreed statement of facts as fully as if hereto attached and made a part thereof.

"That the defendant, The Exchange Bank of Alva, at the time of taking possession of the property described herein, had a valid and subsisting mortgage thereon, and that the amount of money for which it was given to secure was wholly unpaid; and by reason of the conditions herein mentioned,

the said defendant, The Exchange Bank of Alva, had reasonable grounds to believe and did believe in good faith, that its security was impaired and was in great danger of depreciation in the loss and removal of cattle therein described, unless it immediately took possession of said property.

"That afterwards on the 17th or 18th day of May, 1895, the said defendant, The Exchange Bank of Alva, gave notice by posting notices of the sale of said cattle under said chattel mortgage in five public places in the county where the property was to be sold, which said notice contained the names of the mortgagor and mortgagee, the date of the mortgage, the nature of the default, and the amount claimed to be due thereon at the date of the notice, a description of the mortgaged property, conforming substantially to that contained in the mortgage, the time and place of the sale, and the name of the agent and attorney, foreclosing such mortgage, as provided by the laws of the Territory of Oklahoma for the foreclosures of the chattel mortgages by advertisements, and that said notices were posted, as above set forth, ten days before the time specified therein for such sale.

"That notices of the sale of said cattle at public auction were posted, one on the front and north of the United States land office on the public square in Alva, Oklahoma Territory; one on the north and west end of Carter's livery barn on the east side of the public square in Alva; one on the south bridge crossing Eaglechief, south of Alva, one on the north bridge, crossing the north fork of Eaglechief, south of Alva; and one notice on the front of the building used as the post office in the city of Alva, Oklahoma; and that each of said notices were duly posted more than ten days prior to the date of the sale named therein.

"That on the 28th day of May, 1895, the 147 head of said cattle heretofore described were sold at public sale by George T. Parry, the duly authorized agent of the defendant, The Exchange Bank of Alva, under and by virtue of the said chattel mortgage, to the highest and best bidder therefor,

and at the time and place mentioned in the notices posted of said sale.

"That the said 147 head of cattle heretofore mentioned were sold to one J. W. Maxey for the sum of $4.30 per head, and for the total sum of $632.10, he the said J. W. Maxey, being the highest and best bidder therefor, and that the possession of said cattle were then and there delivered to the purchaser, and that the cattle were immediately moved by the purchaser from Woods county, Oklahoma Territory, to Barber county, Kansas, and have not since come into possession of the said estate or its adminitrator.

"That on the 29th day of May, 1895, there was appointed by the probate court of Woods county, Oklahoma Territory, a special administrator for said estate, one James R. Litz, the plaintiff herein, and who immediately on said 29th day of May, 1895, duly qualified as such special administrator, by taking the oath of office and - giving the bond required therefor.

"The said administrator, James R. Litz, did on the 29th day of May, 1895, demand possession of the said cattle from the said purchaser J. W. Maxey, which said demand was then and there refused.

"That neither the special administrator of said estate, nor the general administrator thereof, afterwards appointed on the 27th day of July, 1895, ever received possession of said cattle.

"That the plaintiff herein, James R. Litz, was and is the duly appointed administrator of the estate of John R. Covey, deceased, and has been such administrator at all times since the 27th day of July, 1895.

"That it is further agreed that the deposition of George T. Parry, now on file in the office of the clerk of the district court of Woods county, may be read in so far as it relates to the foreclosure and sale of the property described in the mortgage from John R. Covey, deceased to The Exchange

Bank of Alva, and the conditions then surrounding the property described in said mortgage, the same as if the statements therein made were fully written and embodied in this stipulation.

"That no administrator of said estate, either special or general, was appointed prior to May 29th, 1895, and that the plaintiff herein, James R. Litz, held his trust as special administrator until his appointment as general administrator on July 27th, 1895.

"That the decedent, John R. Covey, died intestate.

"That the value of the 147 head of cattle, hereinbefore mentioned, at the time and place where sold, was twelve ($12.00) and 00|100 dollars per head."

The court found the issues in favor of the defendant, and against the plaintiff. Motion for new trial was duly filed and overruled, and exceptions saved; and the plaintiff brings the case here, on case made, for review.

Opinion of the court by

HAINER, J.: The question presented to this court is, whether or not the holder of a chattel mortgage, who in good faith deems himself insecure, after the death of the mortgagor, who dies intestate, before the debt is due, and prior to the appointment of an administrator, either a special or general, can take possession of and sell the property covered by said mortgage.

This action is based upon section 1603 of Wilson's Annotated Statutes of Oklahoma, of 1903, which provides as follows:

"If any person before the granting of letters of testamentary or of administration, embezzles or alienates any of the moneys, goods, chattels or effects of a decedent, he is chargeable therewith and liable to an action by the executor or administrator of the estate, for double the value of the prop-

erty so embezzled or alienated, to be recovered for the benefit of the estate."

Section 6894 of the same statutes, in regard to the disposition of the property of a decedent, who dies intestate provides as follows:

"The property, both real and personal, of one who dies without disposing of it by will, passes to the heirs of the intestate, subject to the control of the probate court, and to the possession of any administrator appointed by that court for the purpose of administration."

Under the provisions of our statute, a mortgage does not convey title to the property mortgaged, but only creates a lien thereon. Hence, a mortgagor has the undoubted right to pay the indebtedness, and thereby extinguish the lien at any time before the property is sold by the mortgagee. One of the objects of the statutory notice of ten days, which is required to be given in case the mortgagee attempts to foreclose his mortgage is to give the mortgagor an opportunity to pay the indebtedness, and thereby extinguish the lien upon the property. It will thus be seen that under the provisions of our statute in regard to the descent of property of a decedent who dies intestate, the personal property, as well as the real estate, passes to the heirs of the intestate, subject to the control of the probate court, and thence to the possession of the administrator appointed by the court, for the purpose of administration. Hence the right to the possession of personal property, between the time of the death of the intestate and the granting of letters of administration, is, by operation of law, suspended and held in abeyance

In vol. 11 Am. and Eng. Ency. of Law, (2 ed.) page 985, the rule is thus stated:

"The title of administrator on the other hand is derived solely from the court by which his letters are granted, and therefore his title to the decedent's estate does not vest until the letters are granted."

And on the following page, in a note, this doctrine is announced:

"Between the death of the intestate and the granting of letters the legal title to personal property of the intestate is suspended and vested in no one."

See authorities there cited.

In the case at bar the mortgagee proceeded to take possession of the property covered by the chattel mortgage the day following the death of the mortgagor, who died intestate on the 14th day of May, 1895, and on the 17th day of May the mortgagee proceeded to advertise the property for sale, and sold the property on the 28th day of May, 1895, before a special or general administrator had been appointed, and before any application for appointment had been made. But since the property of a decedent passed, the moment of his death, to the heirs, subject to the control of the probate court, the right of the mortgagee to foreclose and sell property was suspended and held in abeyance until a special or general administrator was appointed by the probate court, and any attempt to sell or alienate the property during that period was a wrongful intermeddling with the property of the intestate. (Vol. 22 Cent. Dig. 3549.)

It is true that by the agreed statement of facts it is admitted that the mortgagee "had reasonable grounds to believe and did believe in good faith, that its security was impaired and was in great danger of depreciation in the loss and removal of cattle therein described, unless it immediately took possession of said property." But this fact would not

warrant the mortgagee in advertising and selling the property before a special or general administrator was appointed.

Under the strict provisions of the common law, any intermeddling with the possession of the property, however slight, was wrongful, and the person so intermeddling was known as an executor *de son tort*. But this strict doctrine of the common law has been relaxed by modern authorities, and by virtue of the statutes of most of the states; and we think the rule has been modified in this Territory.

A mortgagee, if he has reasonable grounds to apprehend, and in good faith believes, that the security is about to be lost or materially impaired, has a right to take posession of the property for the purpose of preserving it, but has no right to sell or alienate the same until a special or general administrator has been appointed, whose duty it is to protect the interests and rights of the estate. We think the manifest purpose of the act of the legislature which provides that any person before the granting of letters testamentary or of administration, alienates any of the money, goods, chattels or effects of a decedent, is chargeable therewith, and liable to an action by the executor or administrator of the estate, for double the value of the property so alienated, was to prohibit the doing of just such acts as are alleged to have been committed in this action. In other words, from the agreed statement of facts in this case, we think the defendant comes clearly within the letter and spirit of said act.

We have examined the doctrine as announced by the supreme court of Iowa in the case of *Coke v. Montgomery*, 39 N. W. 386, and the other authorities cited by counsel for defendant in error. In these cases the question under consideration was whether or not the claim should be presented

to the administrator before the mortgagee had a right to foreclose his mortgage, and it was there held that it was not necessary to present the claim to the administrator, on the theory that the mortgagor's contract did not terminate with his death, and that there was no provision of the statute which required a mortgagee of chattels to file his claim, and await the slow process of administration to adjust priorities and determine his rights. And that if the foreclosure was wrongful, or the debt had been paid, the administrator had ample authority for protecting the estate by injunction, or other appropriate action.

In all these cases cited by counsel, it appears that an administrator had been appointed, and the sole question was whether or not it was necessary to present the claim to the administrator; and whether a person who had an interest in the estate was a wrongdoer and intermeddler from the mere fact of taking possession of the property in good faith for the purpose of preserving the same.

We think there is no conflict between the authorities cited and the doctrine announced herein. Manifestly the contract of the mortgagor does not terminate with his death; but by operation of law it is suspended and held in abeyance until an administrator is appointed.

Our conclusion then is that the court below erred in holding that, prior to the appointment of a special or general administrator, the mortgagee had the power and authority to sell or alienate the property. For the reasons herein stated, the judgment of the district court is reversed, and the cause remanded with directions to grant a new trial.

Pancoast, J., who presided in the court below, not sitting; all the other Justices concurring.